UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| MISTY L. VANTREASE, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:13-cv-861 |
| ) | |
| v. ) | Honorable Paul L. Maloney |
| ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | **OPINION** |
| ) | |
| Defendant. ) | |
| _____ ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claims for disability insurance benefits (DIB) and supplemental security income (SSI) benefits. On April 1, 2010, plaintiff filed her applications for DIB and SSI benefits.[1] (Page ID 199-209). She alleged an August 16, 2009, onset of disability.[2] (Page ID 199, 203). Her claims were denied on initial review. (Page ID 108-23). On January 31, 2012, she received a hearing before an administrative law judge (ALJ), at which she was represented

---

[1] April 1, 2010, is a protective filing date. *See Martin v. Commissioner*, 1:13-cv-1254, 2015 WL 518595 at *1 n.1 (W.D. Mich. Feb. 9, 2015). The actual filing dates were April 8, 2010, on the application for SSI benefits (Page ID 199), and April 24, 2010, on the application for DIB benefits (Page ID 203).

[2] SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed. Thus, May 2010 is plaintiff's earliest possible entitlement to SSI benefits.

by counsel. (Page ID 55-104). On February 3, 2012, the ALJ issued a decision finding that plaintiff was not disabled. (Page ID 34-43). On June 11, 2013, the Appeals Council denied review (Page ID 23-25), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision denying her claims for DIB and SSI benefits. She asks the court to overturn the Commissioner's decision on the following grounds:

1. The ALJ committed reversible error when he failed to give controlling weight to the opinions of Curtis Simmons, M.D., a treating physician;

2. The ALJ committed reversible error when he "failed to assess the effects of plaintiff's fibromyalgia and migraine headaches on her residual functional capacity[;]" and

3. The ALJ committed reversible error by "finding that plaintiff could return to a 'made work' job[.]"

(Statement of Errors, Plf. Brief at 5-6, docket # 13, Page ID 410-11). The Commissioner's decision will be affirmed.

**Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.

*Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## **Discussion**

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from August 16, 2009, through the date of the ALJ's decision. (Op. at 3, Page ID 36). Plaintiff had not engaged in substantial gainful activity on or after August 16, 2009. (*Id.*). Plaintiff had the following severe impairments: obesity, spina bifida occulta, small L4/5 disc protrusion, and minimal anterior wedging of

lower thoracic vertebral bodies. (*Id.*). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (Op. at 6, Page ID 39). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> Claimant has the residual functional capacity to lift/carry 20 pounds occasionally, 10 pounds frequently, and stand/walk 2 hours and sit 6 hours in an 8-hour workday; frequently push/pull with all extremities, balance, and climb ramps or stairs; occasionally stoop, kneel, crawl and crouch; and never climb ladders, ropes, or scaffolds.

(*Id.*). The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible. (*Id.* at 7-8, Page ID 40-41). The ALJ found that plaintiff was not disabled at step 4 of the sequential analysis because she was capable of performing her past relevant work as a bookkeeping clerk. (*Id.* at 8, Page ID 41).

Alternatively, the ALJ found that plaintiff was not disabled at step 5 of the sequential analysis. Plaintiff was 36 years old as of her alleged onset of disability and 39 years old as of the date of the ALJ's decision. Thus, at all times relevant to her claims for DIB and SSI benefits, plaintiff was classified as a younger individual. (Op. at 8, Page ID 41). Plaintiff has at least a high-school education and is able to communicate in English. (*Id.*). The transferability of job skills was not material to a disability determination. (*Id.*). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 6,200 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing. (Page ID 99-101). The ALJ found that this constituted a significant number of jobs. Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (Op. at 9-10, Page ID 42-43).

**1.**

Plaintiff argues that the ALJ committed reversible error when he failed to give controlling weight to the opinions of Curtis Simmons, M.D., a treating physician. (Plf. Brief at 8-11, Page ID 413-16; Reply Brief at 1-2, Page ID 439-40). The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner.[3] 20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling, deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable

---

[3]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight, it should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38

(6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

The ALJ carefully considered all the evidence that plaintiff presented in support of her claims. On May 8, 2009, plaintiff appeared at Summit Healthcare Group in Battle Creek Michigan. Plaintiff reported that a recent fall had aggravated her chronic back pain. Plaintiff was 5' 3" tall and weighed 228 pounds. Plaintiff was diagnosed with hypertension, degenerative changes in her lumbar spine, and spina bifida occulta. Plaintiff signed a controlled substance agreement and Dr. Simmons began prescribing narcotic medication. (Page ID 307-08). The MRI of plaintiff's lumbar spine, dated June 22, 2009, was a "stable study" with no significant changes when compared to an earlier study, dated April 21, 2006. The 2009 MRI showed a "small mid to left paracentral disc protrusion at L4-5 causing minimal mass effect upon the anterior aspect of the thecal sac and not lateralizing to the foramina." It revealed "[n]o spinal stenosis or new disc protrusions or focal root sleeve compression[.]" (Page ID 311). On July 1, 2009, Dr. Simmons informed plaintiff that the MRI results showed "no change." Plaintiff stated that she was having pain "mainly when the weather [was] cold and damp." (Page ID 303). On July 30, 2009, plaintiff reported that "Topamax was making her nauseated and wanted to lower [the dosage] to 50 mg. BID." Dr. Simmons modified the Topamax prescription as requested. (Page ID 301-02).

Plaintiff alleged an August 16, 2009, onset of disability. On August 28, 2009, plaintiff described her back as "stable." (Page ID 299). On September 24, 2009, Dr. Simmons found that plaintiff maintained normal motor strength. Her back was normal with the exception of tenderness in the lumbar

sacral region with "decreased flexion to 60 degrees." Dr. Simmons instructed plaintiff to increase her activity level, use appropriate back mechanics, and continue stretching exercises. (Page ID 297-98).

On February 17, 2010, plaintiff asked Dr. Simmons to fill out the paperwork that would allow her to have a handicapped parking sticker on her car. Plaintiff's back was normal other than some tenderness in the lumbar sacral region. Nonetheless, Dr. Simmons completed the paperwork for plaintiff as requested. (Page ID 289-90).

On March 17, 2010, plaintiff stated that she had experienced constipation from medications, but otherwise she was "tolerating meds well." Her weight was down to 207 pounds. (Page ID 287). In April 2010, plaintiff filed her applications for DIB and SSI benefits. On April 12, 2010, she reported to Dr. Simmons that she was feeling lightheaded and felt like she might pass out. Plaintiff's general condition was "normal except [she was] obese." (Page ID 285). She weighed 206 pounds. Dr. Simmons ordered a comprehensive metabolic panel and other tests. (Page ID 285). The test results revealed that plaintiff had a urinary tract infection and "slightly elevated" blood sugar, AST and ALT. (Page ID 283-84).

On June 16, 2010, plaintiff returned to Dr. Simmons, ans she stated that she was "wondering if she ha[d] fibromyalgia." (Page ID 317). Simmons palpated "16/18 tender points" and gave plaintiff a prescription for Lyrica. In addition, he found that plaintiff was oriented in all three spheres. She had "intact recent and remote memory, judgment and insight, normal mood and affect." (Page ID 318). During a follow-up examination on July 15, 2010, plaintiff related that "Lyrica [was] really helping with her pain." (Page ID 315). No tender points were noted during the July 2010 examination, nor in any other examination performed by Dr. Simmons. (Page ID 315-16).

On August 19, 2010, plaintiff appeared at the emergency department at a Battle Creek hospital complaining of an increase in her back pain. Plaintiff denied experiencing numbness, tingling, or focal weakness. She was alert and cooperative. Her muscle strength and pulses were "strong and equal." Neurologically, there was no tenderness at the lumbar spine. X-rays of plaintiff's lumbar spine did not reveal any acute process. An abdominal film revealed a stool in plaintiff's colon. She was instructed to drink a bottle of magnesium citrate when she returned home. (Page ID 321-25).

X-rays of plaintiff's lumbar and thoracic spine, dated August 21, 2010, showed no significant abnormalities. The x-rays taken of plaintiff's knees were normal. (Page ID 324-25). On September 2, 2010, Shanthini Daniel, M.D., reviewed the evidence and offered an opinion that plaintiff retained the RFC for a range of light work. (Page ID 110-14).

On November 17, 2010, plaintiff was examined in a Tennessee hospital. (Page ID 354-55, 386). Plaintiff stated that she had moved from Michigan to Tennessee in October 2011, and she had run out of the narcotic medication that had been prescribed for her in Michigan. Plaintiff reported that she had a history of intermittent headaches that were relieved with medication. (Page ID 354, 386). Plaintiff related her symptoms of nausea, vomiting, diarrhea, shakes, and chills. She was diagnosed with narcotic withdrawal and back pain. She was provided with a prescription for a dozen 7.5 mg. Lortab tablets with no refills, a Duragesic patch, and a prescription for Phenergan to help with the pain and nausea. (Page ID 354-55). On November 21, 2010, plaintiff returned to the hospital with similar symptoms. (Page ID 357-60). She stated: "I am withdrawing from narcotics." (Page ID 357). Plaintiff indicated that she felt "shaky, anxious, and [was] having some nausea without vomiting. She denie[d] any headache, chest pain, shortness of breath, abdominal pain, diarrhea, lightheadedness, altered mental status, or focal neurologic deficits."

(Page ID 357). Doctors found that plaintiff was alert and oriented in all three spheres. She did not have any sensory or motor deficits. Her extremities were warm and "well perfused without clubbing, cyanosis, or edema." (Page ID 358). Plaintiff was again counseled that it was inappropriate to use the emergency department as a source of pain medication. She was treated with a Fentanyl patch, Lortab and Zofran. She was discharged with limited prescriptions and advised to follow-up with either her primary care physician or a pain management clinic. (Page ID 357-58).

Medical records indicate that plaintiff maintained her Tennessee residence from November through at least March of 2011.[4]  (Page ID 330-52). She was seen by James Anderson, M.D. Dr. Anderson prescribed a number of medications and gave plaintiff B12 injections. (*Id.*).

On June 30, 2011, plaintiff appeared at an emergency room of a hospital in Battle Creek, Michigan. She complained of left hand pain. She related that she and her significant other had been attempting to place an air conditioning unit in a window when the window came down and hit her hand. Plaintiff denied experiencing any weakness, fatigue or fevers. She had no headache, lightheadedness or dizziness. Plaintiff was alert and oriented in all three spheres. Her speech was appropriate and coherent. X-rays of plaintiff's hand revealed no fractures or dislocations. She was diagnosed as having a contusion to the left third digit and was "discharged home without any medications." (Page ID 373-75).

On July 26, 2011, Dr. Simmons completed the two-page RFC questionnaire provided by plaintiff's attorney. Dr. Simmons offered opinions that plaintiff had extreme restrictions such as being limited to lifting 5 pounds on an occasional basis, a complete inability to stand during a workday, and sitting a maximum

---

[4]Plaintiff testified that she lived in Tennessee from October 2010 to April 2011. (Page ID 82-83).

of two hours during a workday. He asserted that plaintiff would need to sit with her legs elevated "most of the day" and would likely miss work "4 or more days a month." (Page ID 327-28).

On August 19, 2011, plaintiff reported to Dr. Simmons that she had "achy pain in [her] right leg." (Page ID 381-82). Plaintiff weighed 211 pounds. Dr. Simmons did not list fibromyalgia among plaintiff's medical problems, major or minor. (Page ID 381). Instead, he offered a diagnosis of an unspecified "myalgia/myositis." (*Id.*). X-rays of plaintiff's lumbar spine, dated August 22, 2011, revealed "No acute abnormality." X-rays of her thoracic spine showed "mild anterior wedging of the lower thoracic vertebral bodies." There was "no lytic or blastic abnormality" and "no paraspinal mass." (Page ID 372, 384-85). On August 21, 2011, Dr. Simmons found that plaintiff's general condition was normal, other than her morbid obesity. (Page ID 379). Her back was normal except for tenderness in the thoracic/lumbar region. Her extremities were normal. She displayed a normal gait and station. She had "[n]o malalignment, asymmetry, crepitation, deficits, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis, or extremities." (*Id.*). Plaintiff's neurologic examination was normal. She was oriented in all three spheres. Her recent and remote memory was intact. Her affect and mood were normal. (*Id.*).

It was against this backdrop that the ALJ considered and rejected the extreme restrictions that Dr. Simmons had suggested in his RFC questionnaire responses:

> I considered the reports and July 26, 2011, assessment from Dr. Simmons. On that document furnished by counsel (Exhibit 6F), the clinician listed restrictions for claimant incompatible with an ability to perform any competitive full time employment (e.g. claimant could [] sit no more than 2 hours in a workday, claimant could [perform] no frequent lifting; claimant would need to elevate her legs "most of the time" during a workday; claimant would be absent from the work site 4, or more days monthly, etc.). Simmons offered views of the claimant's pain (a credibility determination) was severe and would constantly interfere with her attention and concentration. Nothing in Simmons' clinical narratives, or diagnostic studies he ordered, justifies such

level of dysfunction. Indeed, as discussed previously, Simmons' objective findings were very modest and he made no mention of meaningful physical dysfunction, inattentiveness or lack of focus manifested by claimant. As Dr. Simmons' views are not well supported objectively, and are contraindicated by substantial evidence in the record, they are given little weight.

(Op. at 8, Page ID 41). The restrictions suggested by Dr. Simmons were not supported by the record as a whole and were inconsistent with his own treatment records. The Sixth Circuit has repeatedly held that inconsistencies between proffered restrictions and the underlying treatment records are "good reasons" for discounting a treating source's opinions. *See, e.g., Hill v. Commissioner*, 560 F. App'x 547, 549-50 (6th Cir. 2014); *Fry v. Commissioner*, 476 F. App'x 73, 75-76 (6th Cir. 2012). The court finds no violation of the treating physician rule.

**2.**

Plaintiff's second claim of error is that the ALJ committed reversible error when he "failed to assess the effects of plaintiff's fibromyalgia and migraine headaches on her residual functional capacity[.]" (Plf. Brief at 5, Page ID 410). Plaintiff offers a series of disorganized arguments under this heading. Her primary argument is not even alluded to in the heading. She argues that the ALJ failed to adequately consider her obesity. (Plf. Brief at 14-17, Page ID 419-22). Plaintiff's argument cannot withstand scrutiny. The ALJ gave careful and appropriate consideration to plaintiff's obesity. (Op. at 3, 6, 7, Page ID 36, 39, 40). He considered plaintiff's obesity in combination with other impairments at all stages of the sequential evaluation. The ALJ was not required to use any particular "mode of analysis" in considering the effect of plaintiff's obesity. *See Shilo v. Commissioner*, No. 14-3417, __ F. App'x __, 2015 WL 349031, at * 3 (6th Cir. Jan. 28, 2015). The ALJ complied with the requirements of SSR 02-01p and

considered plaintiff's obesity when he made his factual finding regarding plaintiff's RFC.[5] The ALJ found that plaintiff retained the RFC for a range of light work. (Op. at 6, Page ID 39). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d at 534. The ALJ's factual finding regarding plaintiff's RFC is supported by more than substantial evidence.

Plaintiff's argument that the ALJ gave inadequate consideration to her fibromyalgia is equally meritless.[6] The ALJ was correct that the medical record regarding plaintiff's fibromyalgia consisted of plaintiff's suggestion that she might have fibromyalgia on June 16, 2010, her giving a number of positive responses when trigger points were tested on that one occasion, and displaying no tender points on any subsequent examination.[7] (Op. at 4-5, Page ID 37-38; *see* Page ID 315-17). The ALJ did not commit

---

[5]The Sixth Circuit has repeatedly held that SSR 02-01p does not establish any particular procedural mode of analysis for addressing the claims of obese disability claimants. *See Coldiron v. Commissioner*, 391 F. App'x 435, 442-43 (6th Cir. 2010) (It is "a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular mode of analysis for obese disability claimants.") (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)); *Nejat v. Commissioner*, 359 F. App'x 574, 577 (6th Cir. 2009); *see also Titles II & XVI: Evaluation of Obesity,* SSR 02-1p (reprinted at 2002 WL 34686281) (SSA Sept. 12, 2002).

[6]In *Rogers v. Commissioner*, 486 F.3d 234 (6th Cir. 2007), the Sixth Circuit acknowledged the medical difficulty of making a diagnosis of a condition that "present[s] no objectively alarming signs." *Id.* at 243. "[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits[.]" *Vance v. Commissioner*, 260 F. App'x 801, 806 (6th Cir. 2008); *see Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) ("[A] diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits."). " 'Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [the claimant] is one of the minority.' " *Vance v. Commissioner*, 260 F. App'x at 806 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *Torres v. Commissioner*, 490 F. App'x 748, 754 (6th Cir. 2012) (same).

[7]The most recent progress notes from Dr. Simmons suggest that he abandoned a diagnosis of fibromyalgia in favor of characterizing plaintiff's pain complaints as an unspecified "myalgia/myositis." (Page ID 377, 381).

error on the present record in finding that plaintiff did not have any significant functional restrictions stemming from fibromyalgia.

Plaintiff offers the following two-sentence argument regarding her headaches, supported by no legal authority: "Plaintiff complained throughout the MER [medical evidence of record] about the effects of her migraine headaches on her ability to function. The neurologist, Dr. James P. Anderson, M.D., of Affiliated Neurologists found plaintiff suffered from severe headaches throughout his treatment of her. (AR 299-322)[.]" (Plf. Brief at 17, Page ID 422). " 'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.' " *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)); *see also McPherson*, 125 F.3d at 995-96 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (quoted citation omitted)).

Even assuming the argument had not been waived, it is meritless. The medical evidence of record undermines rather than supports plaintiff's argument. Plaintiff frequently complained of low back pain, but seldom complained of headaches. During the period she lived in Tennessee, plaintiff generally did self-

---

Plaintiff invokes SSR 12-2 in her reply brief (Reply Brief at 2, docket # 15, Page ID 440). That social security regulation did not apply because it did not go into effect until July 25, 2012, more than five months after the ALJ's decision. *See Titles II and XVI: Evaluation of Fibromyalgia* (SSA July 25, 2012) (reprinted at 2012 WL 3104869, at * 1) ("Effective Date: July 25, 2012."). The ALJ did not commit error by failing to apply a social security ruling that did not go into effect until months after the ALJ entered his decision. *See Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007); *White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, at * 22 (E.D. Mich. Sept.16, 2013). The ALJ's decision is the final administrative decision subject to appellate review where, as here, the Appeals Council denies review. *See DeLong v. Commissioner*, 748 F.3d 723, 724 (6th Cir. 2014); *Rabbers v. Commissioner*, 582 F.3d 647, 651 (6th Cir. 2009).

report headaches on the questionnaire forms provided by Dr. Anderson. (Page ID 301-02, 304-05, 340-41, 344-45, 348-49, 351-52). However, Anderson never opined as to any functional restrictions stemming from plaintiff's headaches. Further, plaintiff reported to emergency room physicians in Tennessee that she had a history of "intermittent" headaches that were relieved with medication. (Page ID 354, 386). Plaintiff went through most of her testimony without claiming any headache-related limitations. (Page ID 56-91). It was only when prompted by her attorney's question, "Now tell me about your headaches" (Page ID 92), that she offered testimony asserting that she experienced migraine headaches about twice a week and that she was experiencing one during the hearing. (Page ID 92-93). The ALJ's observation that the evidence indicated that plaintiff's headache symptoms were "rather intermittent and infrequent in nature" (Op. at 6, Page ID 39) is supported by more than substantial evidence. The same is true of the ALJ's finding that plaintiff's headaches did not compromise her ability to perform work-related tasks. (*Id.*).

**3.**

Plaintiff argues that the ALJ committed reversible error by "finding that plaintiff could return to a 'made work' job." (Plf. Brief at 17-19, Page ID 422-24; Reply Brief at 4, Page ID 442). Specifically, plaintiff argues that she was last employed as a bookkeeper "which was a job her mother 'made for her' (AR 44) which [was] an accommodation job, a fact which eluded the Administrative Law Judge." (Plf. Brief at 18, Page ID 423). Plaintiff contends that her job was a "made work" job, which "regardless of the stated level of earnings, impl[ied] that the claimant was not working at the SGA level." (*Id.* at 19, Page

ID 424) (citing Magistrate Judge Leslie Foschio's report and recommendation in *Nazzaro v. Callahan*, 978 F. Supp. 452, 459 (W.D.N.Y. 1997)).[8]

The ALJ questioned plaintiff at length about the work she last performed before her alleged onset of disability:

> Q   When did you last work?
>
> A   My last, my last actual date of employment was August of '09, and I did a little bit of – because I had to train my mom, the paperwork I was doing, because I worked for her. She had made a job at her foster care home for me so that I could make some kind of money.
>
> Q   Okay.
>
> A   And I had to go in and train her on what – how I got her paperwork because I just couldn't do it and I was forgetting to do paperwork. I couldn't remember.
>
> Q   Does your mom own a foster care facility?
>
> A   Yes, sir.
>
> Q   Okay. And you worked for her?
>
> A   Yes.
>
> Q   Were you working full-time?
>
> A   I would go from 30 to my – my hours always varied because of calling in. I couldn't go in most of the time. It got down to where I was barely even going into work at all.

---

[8] *Nazzaro* is not persuasive authority because the facts of that case are not remotely analogous. In *Nazzaro*, the key evidence was a letter from the Western New York Association for the Learning Disabled (WNYALD) which advised the Social Security Administration of the severity of David Nazzaro's learning disability and the nature and extent of the services provided by his job coach, and which stated that Mr. Nazzaro had never worked without such a job coach and he could not maintain employment without his coach. 978 F.2d at 456, 462; *see Reen v. Commissioner*, No. 08-cv-1175, 2009 WL 198743, at * 4-5 (W.D. Pa. Jan. 27, 2009).

> Q	Were you doing the kind of work that she would have had to hire somebody else to do?
>
> A	The paper – yeah, the paperwork stuff, it was something that was – I don't know how to – because she had made the job for me, so once I got that – doing that –
>
> Q	Right.
>
> A	– she wanted to find somebody else that would be able to take that job on because she got that out of the workload –

(Page ID 66-67).

Further questioning by the ALJ established that Michigan classified the facility as a "family home" and it was a residential facility for mentally handicapped individuals. (Page ID 68-69). Plaintiff testified that she worked at this job for "a year-and a half" to "two years." (Page ID 78). Plaintiff performed bookkeeping and estimated that she was sitting about two-thirds of the day at the job and lifted up to ten pounds. (Page ID 78). When the ALJ asked whether plaintiff quit this job because she could not perform the required lifting anymore or because her doctor told her to quit, plaintiff's responded that it was "[a] little of both." (Page ID 80-81). The vocational expert classified plaintiff's work as a bookkeeping clerk as sedentary and unskilled as actually performed and semiskilled as generally performed. (Page ID 98-99).

Plaintiff's attorney did not elicit testimony from his client or any other witness attempting to establish that, when plaintiff performed her work as a bookkeeper, she performed work under "special conditions" such that it should not be considered as SGA. (Page ID 86-97). Her attorney presented no argument to the ALJ attempting to carry plaintiff's burden of rebutting the presumption that her work constituted SGA. (Page ID 104; *see also* Prehearing Brief, Page ID 262-63). Plaintiff's earnings as a bookkeeping clerk (Page ID 210, 221, 224) exceeded the SGA threshold. This created a rebuttable presumption of SGA.

20 C.F.R. §§ 404.1574, 416.974. It was plaintiff's burden to present evidence sufficient to rebut the presumption that the wages that she earned constituted SGA. *See Dinkel v. Secretary of Health & Human Sevs.*, 910 F.2d 315, 319 (6th Cir. 1990). A general assertion that plaintiff's work was "accommodated" does not suffice. *See Fisher v. Barnhart*, 129 F. App'x 297, 302 (7th Cir. 2005).

Plaintiff's testimony did not rebut the presumption. Her claim that she worked under special conditions was not substantiated by records from the State of Michigan or her employer. *Dinkel*, 910 F.2d at 319. The ALJ's finding that plaintiff's work as a bookkeeping clerk was past relevant work is supported by more than substantial evidence.

## Conclusion

For the reasons set forth herein, the Commissioner's decision will be affirmed.


Dated:  March 26, 2015             /s/ Paul L. Maloney
                                   Paul L. Maloney
                                   Chief United States District Judge